[L. A. No. 5202. In Bank.—December 21, 1920.]

UNION HOLLYWOOD WATER COMPANY (a Corporation), Appellant, v. CITY OF LOS ANGELES (a Municipal Corporation), et al., Respondents.

[1] EVIDENCE—VALUE OF THING—COST.—The cost of a thing is evidence of its value, especially where it appears that it is comparatively new and where it has no established market value, as in the case of second-hand goods, lands not on the market, water in the ground, buildings, pipe-lines laid in the ground, and the like.

[2] WATER RATES—DETERMINATION OF QUESTION OF CONFISCATION—VALUATION OF PLANT—CONSIDERATION OF TESTIMONY.—In an action by a water company to enjoin the enforcement of a municipal ordinance fixing rates on the ground that the rates were so low as to constitute a confiscation of plaintiff's property, the court in hearing testimony as to the value of the respective parts of the plant was not compelled to take the estimate of any witness as a whole, but could accept such opinion on the item as to which it was lowest and reject it on others, and compute the value on the combined lowest estimates of all or any number of the witnesses.

[3] ID.—DEPRECIATION OF PLANT—CONSIDERATION IN FIXING RATES.—A water company in the fixing of rates is entitled to have an amount allowed on account of depreciation and for the rebuilding of the plant as it becomes outworn.

[4] ID.—DETERMINATION OF AMOUNT FOR DEPRECIATION — METHODS.—In determining the amount to be allowed for depreciation, the court may either take the value of each component item of property at the time the rate is fixed and divide the same by the number of years then remaining of its life and turn over the amount of the quotient to the owner each year of such life by an addition to the rates sufficient to make up that sum, or it may provide for a sinking fund, the amount of which, if invested each year at current rates of interest on money loaned on safe security,

will produce the present value at the end of the life, and add such sum to the amount to be raised by rates each year.

[5] Id.—Receipts from Pipe Bonuses—Part of Capital Investment.—Pipe bonuses received from owners of tracts of land in proposed subdivisions in consideration of the water company laying mains in such subdivisions is not a part of the legitimate receipts from the operation of the company in its character as a public service company, but the mains laid is a part of the plant and the money expended in so doing is a part of its capital investment.

[6] Id.—Source of Expenditures Immaterial.—The fact that money expended by a public water company was given to it by other persons is immaterial in determining the value of the plant for rate-fixing purposes. The source of the money invested does not affect the question of value.

[7] Id.—Rates of 1.27 Per Cent Confiscatory — Constitutional Law.—A municipal ordinance fixing water rates which only permits 1.27 per cent interest on the capital investment is confiscatory and in violation of the constitutional provisions prohibiting the taking of private property for public use without due compensation and without due process of law.

APPEAL from a judgment of the Superior Court of Los Angeles County.   J. P. Wood, Judge.   Reversed.

The facts are stated in the opinion of the court.

Haas & Dunnigan and Sheldon Borden for Appellant.

Albert Lee Stephens, Jess E. Stephens and Wm. P. Mealey for Respondents.

SHAW, J.—This is an action to enjoin the defendant, city of Los Angeles, from enforcing an ordinance of said city, adopted on June 2, 1911, fixing the water rates to be charged by the plaintiff, a public service water company, during the ensuing year, beginning July 1, 1911, and to have said ordinance declared void on the ground that the rates were so low as to constitute a confiscation of plaintiff's property. Judgment was given for the defendants and the plaintiff appeals.

The action was begun in June, 1911.   The trial began in October, 1911, and the findings were filed and judgment rendered on January 19, 1915.

The basis of the judgment, as set forth in the findings, is shown by the following table of values, receipts, and expenses:

| | |
|---|---:|
| Value of plaintiff's plant after deducting depreciation.......... | $835,291.40 |

| | | |
|---|---:|---:|
| Receipts from operation, including receipts for service connections and meters and sums paid as a bonus for laying pipe-lines in tracts of land ................ | | 141,571.45 |
| Operating expenses for the year in question .............. ........ | $64,263.25 | |
| Annual depreciation ............. | 25,572.96 | 89,836.21 |

| | |
|---|---:|
| Total net earnings ......... | $51,735.24 |

The net receipts amount to 6.19 per cent upon the total value of the plant. If these valuations are correct, the rates could not amount to confiscation and the judgment must be upheld.

The plaintiff claims that the valuations and estimates of receipts and expenses made by the court were erroneous in many particulars. The errors claimed are as follows:

| | | |
|---|---|---:|
| 1. | The value of the plant as found is claimed to be less than its value, as shown by any theory, in the sum of ................ | $10,554.00 |
| 2. | Value of rights of way estimated by defendants' witnesses upon the wrong theory, making a difference in favor of defendant of ................ .................... | 33,494.72 |
| 3. | Discrepancy in value of Sherman tract and Hudson & Selma tract owned by plaintiff ............................... | 67,088.75 |
| | Excluding one-half of the Franklin reservoir site .................. ........ | 14,325.00 |
| 4. | Under-estimate of amount of water owned by plaintiff, value ........ ........... | 37,245.00 |
| 5. | Error in computing value of pipes belonging to the plaintiff situated in the city .. | 42,770.00 |
| 6. | Under-estimate of value allowable for "going concern" .................. .... | 18,705.00 |

| | |
|---|---:|
| Total addition to valuation .........$ | 224,182.47, |
| Making a correct total valuation of .................. ...........$ | 1,059,473.87. |

In computing the net revenue errors are claimed as follows:

1. Error in allowance for depreciation ...... $14,551.29
2. Errors in finding as to operating expenses   8,583.51
3. Errors in finding as to total operating receipts .............. .............. 41,120.43

If these claims are correct the receipts from operation would be only $100,451.02, and the operating expenses and annual depreciation combined would amount to $112,971.01, showing an annual loss to the plaintiff by the rates fixed of $12,519.99. If that were the result the rates would be confiscatory and the ordinance would be void.

With respect to the first item the plaintiff claims that the lowest estimate of the value of the whole plant by any witness was that of defendants' engineer, Sonderegger, who placed it at $845,845.55. The finding that it was worth $835,291.40 is $10,554.15 less than the said minimum estimated by Sonderegger. Plaintiff asserts that this deduction is not explainable by the evidence. There was, however, other evidence of value from which the court may properly have concluded that deductions should be made from that estimate. The plaintiff, about the year 1907, purchased a large part of the stock of the West Los Angeles Water Company, which, previously, had owned and operated the plant, and plaintiff then took over from that company its entire plant. It continued the service and from time to time made additions to the plant as necessity required. The plant was comparatively new at the time of the passing of the ordinance. The secretary of the plaintiff testified that the total cost of the entire plant, up to January 1, 1910, as shown on its books, was $746,489.22. This included the cost of a part of the plant situated outside of the city, which amounted to $43,241.55, leaving $703,247.67 as the cost of the part of the plant within the city. Additions thereto were made during the year 1910 at a cost of $87,549.32, making the total cost, that is, the total amount invested in the plant up to January 1, 1911, $790,796.99.

[1] The cost of a thing is evidence of its value, especially where it appears that it is comparatively new and where it has no established market value, as in the case of second-hand goods, lands not on the market, water in the ground, buildings, pipe-lines laid in the ground, and the like. (*Jennings* v. *Oregon L. Co.*, 48 Or. 287, [86 Pac. 367]; *Angell* v.

*Hopkins,* 79 Cal. 182, [21 Pac. 729]; *Levy* v. *Scott,* 115 Cal.
39, [46 Pac. 892]; *Booth* v. *Pendola,* 88 Cal. 40, [23 Pac.
200]; *Joost* v. *Sullivan,* 111 Cal. 296, [43 Pac. 896]; *Luse* v.
*Jones,* 39 N. J. L. 708; *Jones* v. *Morgan,* 90 N. Y. 10, [43
Am. Rep. 131]; *Norton* v. *Willis,* 73 Me. 580; *Small* v. *Pool,*
30 N. C. 47; *Boggan* v. *Horne,* 97 N. C. 268, [2 S. E. 224];
*Rawson* v. *Prior,* 57 Vt. 609; *Ford* v. *Smith,* 27 Wis. 267;
*Roberts* v. *Dunn,* 71 Ill. 50; 22 Cor. Jur., p. 178, n. 19;
p. 183, n. 12, n. 21; p. 184, sec. 140.) The things above
enumerated constitute the major part of the plaintiff's plant.
Furthermore, there were varying opinions as to the value of
the respective parts of the plant which entered into the total
value above mentioned. **[2]** The court was not compelled
to take the estimate of any witness as a whole. It could
accept such opinion on the item as to which it was lowest
and reject it on others, and compute the value on the com-
bined lowest estimates of all or any number of the witnesses.
For these reasons we cannot say that the court may not have
abated the values of some of the items contained in the tes-
timony of the witness Sonderegger sufficiently to account for
the finding of $835,291.40, and so we must hold that it is not
contrary to the evidence in the respect claimed.

The supposed under-valuation of $35,073 on the plain-
tiff's rights of way was apparently made by deducting
$8,108.12, the value thereof as fixed by two witnesses for the
defendants, from the sum of $43,181.70, the value as esti-
mated by the plaintiff's witnesses. This alone, it is admitted,
would be insufficient to overturn the finding. Plaintiff's
theory is that the defendants' witnesses arrived at the values
given by them by first finding the fee-simple value of the
lands composing the rights of way and then taking twenty-
five per cent thereof as the value of the plaintiff's easements
to lay and maintain pipes therein. It also claims that dam-
ages which the owner of the adjoining land might be entitled
to in a condemnation suit should have been added as a part
of the value or cost of the easements. The pipes would be
laid at a considerable distance below the surface. When the
trenches were filled, the ordinary use of the land would not
be interfered with, except when repairs became necessary,
which would be very infrequently. The apportionment of
twenty-five per cent of the total value as the value of the
easements alone, under these circumstances, does not seem to

us so unreasonable as to require the court to hold that the estimate should have been rejected. The witnesses testified that a water-pipe line does not injure real property at all. They also testified that their opinion of the value of such easements was based on their general experience in dealing with real property and in obtaining rights of way in that vicinity some years before the adoption of the ordinance. It is obvious, therefore, that the finding has support in the evidence.

We think the plaintiff's claim that the sum of $67,088.75 was excluded from the value of the land at Sherman and at the corner of Hudson and Selma Streets is not warranted by the record. Some of the defendants' witnesses gave their opinion as to the value of these lands based on their knowledge of the value of real property in that vicinity. Others valued it by taking into consideration the value of the water derivable therefrom by pumping. The plaintiff's claim is that these values were wholly separate and distinct elements, and that to find the total value the two should have been added together. The court did not so view the testimony, but apparently took each of them as valuations of the land as a whole, including the water. The court's theory does not seem an impossible or unreasonable interpretation of the testimony. We therefore conclude that there is no merit in this claim.

With respect to the item of $14,325 for one-half of the Franklin reservoir site, the value of which was excluded by the court, it is sufficient to say that the entire site included ten acres, valued at $28,650, and that there was evidence from which the court could reasonably conclude that only one-half thereof was necessary for use in the plaintiff's plant.

The claim that the water rights of the plaintiff were undervalued to the extent of $37,245 is also untenable. The water rights consisted merely of the ownership of certain lands in which it had bored wells from which it pumped water. The value of such water rights is, of course, measured by the quantity of water that could be regularly obtained in that way, and that quantity would depend on the quantity of water from rainfall which would find its way into the underlying strata of the land and on the porous nature of the material therein. These conditions are uncertain and the quantity obtainable is necessarily uncertain. The maximum quantity

ever pumped at any time therefrom cannot be safely accepted as the quantity regularly obtainable. Plaintiff's witnesses, nevertheless, gave their opinion of value based on this maximum. The defendants' witnesses estimated the quantity very much lower. The court would have been fully justified in following the opinions of the latter, and we may assume that it did so. It is the difference between these two theories that constitute the under-valuation contended for.

The asserted error of $42,770 in apportioning the value of the pipe-lines of the plaintiff within the city in reality involves nothing more than a conflict in the evidence. The total value of all the pipe-lines, including those within the city and those in the country, and the length of each separately, was first taken. One set of witnesses testified that the value of the separate parts should be apportioned by reference to the receipts from the city service as compared with that from the country service, and accordingly fixed the value of the city service as ninety-five and one-half per cent of the value of both. The other witnesses testified that since the country served by the plaintiff was much more sparsely settled than the territory served by the city part of its system, the length of pipe to each consumer necessary to the service in the country would be much greater than in the city, and that the receipts from the country service would, therefore, be much less compared with the cost and value of the pipe-lines than the receipts from the service within the city. Accordingly, they testified that the value of the city pipe-lines should not be estimated at more than eighty-seven per cent of the total value of all the lines. We think there can be no question but that the theory of the witnesses for the defendants was the more accurate and should have been followed.

The next objection is that the court, in estimating the "going value" of the plant, excluded $18,705 from the computation. The witnesses for the defendants estimated the value of the plant as follows:

| | |
|---|---:|
| Physical property | $653,763.55 |
| Water | 84,122.00 |
| Real estate and rights of way | 54,675.00 |
| Going concern | 53,285.00 |
| Total | $845,845.55 |

The witnesses testified that in estimating the "going concern" value they considered as one of the factors involved in the calculation the income of the plaintiff for the year 1910, under the rates prevailing for that year. The rate ordinance for that year had been attacked by plaintiff in an action similar to the present action, and on its motion in that action an order was made in that case that the rates therein claimed for that year by plaintiff should be paid, but that the excess of such rates over those fixed by the ordinance for that year should be impounded to await the event of that suit. This had been done, and the impounded money amounted to $18,705. They did not include this sum as part of plaintiff's income for 1910. This is the error complained of. The judgment in that action was that the rates fixed for that year were reasonable and that the rate ordinance for that year was valid. That judgment has since been affirmed. (*Union Hollywood Water Co.* v. *Los Angeles,* 178 Cal. 206, [172 Pac. 983].) It must, therefore, be presumed that the money was properly impounded, that it formed no part of plaintiff's income for 1910, and that it does not belong to plaintiff. The witnesses were correct in excluding it in making their compilations. Consequently, the court below did not err in accepting their estimate, so far as that sum was involved.

[3] The next objection is that the court should have allowed $14,551.29 more on account of annual depreciation. The plaintiff's witnesses estimated this amount at $40,124.25 and the defendants' witnesses at $25,572.96. The court adopted the last-mentioned estimate. Plaintiff claims that the larger sum was the proper allowance to be made.

Allowances of this character are made because of the fact that a plant constructed for public service wears out and that if the service is to be continued it must be replaced at the end of its life. The owner is entitled to a reasonable return on his invested capital while he continues the service. If it is to be kept up he must also collect from the consumers enough to rebuild the plant when it becomes outworn. The annual rates are, therefore, increased to provide such sum.

[4] Several methods of obtaining the fund necessary for this purpose have been in use. All of them begin with an estimate of the probable life of the several items or classes of property composing the plant at the time the rate is fixed and of the then present value thereof. Each of them is de-

signed to return to the owner, during the life of the particular item, the entire present value of that item at the time the rate is fixed, while at the same time giving the owner a reasonable return on the invested capital value of such item. The sum of the annual allowance for depreciation on each item or class of property constitutes the total allowance on this account to be collected from consumers each year in the form of rates.

A recognized method is to take the value of each component item at the time the rate is fixed and divide the same by the number of years then remaining of its life. The quotient is to be returned to the owner each year of such life by an addition to the rates sufficient to make up that sum. Under this plan the allowance for depreciation is the same each year of the succeeding life of the item in question, but as the sums thus returned to the owner are to be deducted each year from the value of the previous year, to ascertain the then present value of the plant, the amount included in the rate on account of interest on capital invested is gradually reduced during the succeeding years. While the sum allowed for depreciation is constant, the annual rate allowance for interest on capital is gradually reduced and the consumer pays a much higher rate at the beginning of the period than at the end. This plan, we understand, was the one adopted by the witnesses for the plaintiff, and which it is insisted must be followed.

Another plan is known as the sinking fund plan. Instead of dividing the present value by the number of years of life remaining, an annual contribution by the consumers to a sinking fund is provided. The amount which, if invested each year at current rates of interest on money loaned on safe security, would produce the present value at the end of the life, is ascertained or estimated. This sum is added to the amount to be raised by rates each year. It is assumed that by investing these sums as they come in, the owner may reimburse himself for the present value, so that at the end of the life he will have funds sufficient to replace the property. The sum added to the sinking fund is the same each year. The rates are fixed so as to raise this addition to the sinking fund and also allow a reasonable return to the owner on the original estimated value each year. By this plan the consumer pays the same rate during the entire life of the par-

ticular item in question, but the rate in the first years of the life is smaller than under the first-mentioned plan, and is larger in the later years.

There is a modified sinking fund plan sometimes used whereby the addition for sinking fund is increased each year by the amount of the estimated accrued interest on the previous years' contribution to sinking fund, and the amount allowed to the owner for interest on capital investment is reduced by the same amount. The result is the same for both parties. The rate remains constant throughout the term of life and the owner receives the same amount each year, but it is apportioned differently between the sinking fund account and the interest on capital account.

We understand that the amount estimated by the defendants' witnesses and allowed by the court as for depreciation was determined by one or the other of the last-mentioned methods. The tables used by the witnesses in computing this amount are not given in the record, and it is difficult to understand from their explanations which one of the two was taken. It is not important to determine that point. The method of procedure under either plan would result in justice both to the consumer and owner, and would accomplish the ultimate object of providing the necessary fund for reconstruction. We can see no reason why either one, if allowed by the court, was not just and proper. If a change from the sinking fund plan to the so-called "straight line" plan contended for by plaintiff were made hereafter, some injustice might possibly follow. But this might happen under either plan. We must assume, in theory at least, that the proper public authority will act fairly in the matter. It may be noted that the power to fix rates passed to Railroad Commission on November 3, 1914 (Const., art. XII, sec. 23), and that the commission usually, if not invariably, follows the sinking fund method of estimating the addition to the rates on account of the necessity of providing a fund for ultimate reconstruction. (*City of Los Angeles* v. *Southern California Gas Co. et al.*, 13 R. R. Com. Dec. 728; *Town of Antioch* v. *Pacific Gas & Electric Co.*, 5 R. R. Com. Dec. 40.) Furthermore, since the estimate of the value of the plant by the plaintiff's witnesses was much larger than that made by the defendants' witnesses and accepted by the court, the major portion of the difference between the two allowances for depreciation is

accounted for by the difference in amount which the same percentage would produce on the respective estimates of value.

In *Redlands etc. Water Co.* v. *Redlands,* 121 Cal. 312, [53 Pac. 791], and *San Diego Water Co.* v. *San Diego,* 118 Cal. 583, [62 Am. St. Rep. 261, 38 L. R. A. 460, 50 Pac. 633], cases arising when the law provided for annual fixing of rates by city councils, prior to 1914, it was held that the rates should not be "so fixed as to enable it [the water company] to set apart a certain amount each year for the depreciation of its plant." In *Contra Costa Water Co.* v. *Oakland,* 159 Cal. 334, [113 Pac. 668], these decisions were virtually overruled on this point and the rulings of the United States supreme court on that question were followed. (*Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1, [53 L. Ed. 371, 29 Sup. Ct. Rep. 148, see, also, Rose's U. S. Notes].) The question may now be regarded as settled.

The claim that $8,583.51 was improperly deducted by the court from the operating expenses shown by the evidence proves, upon examination, to be a mere question of a conflict of the evidence upon which the decision of the court below is conclusive.

[5] The remaining point is the contention that the receipts from operation were over-estimated to the amount of $41,120.43. The finding of $141,571.45 as the total receipts from operation states that it includes money paid by consumers at the rate fixed by the ordinance and also "hydrant receipts, irrigation water rentals, charges for putting in meters and services (which meters and services were retained and became the property of plaintiff), land rentals, city pipe-line bonuses (being charges required of property owners for putting in pipe-lines, which pipe-lines were retained as and became the property of plaintiff), delinquent charges and miscellaneous receipts."

The record shows that this item was made up of the following charges:

Receipts from rate-payers at ordinance rates ....$100,172.10
Receipts from meters and services .............  26,243.45
Receipts from pipe bonuses ...................  14,877.03
Miscellaneous receipts and delinquent charges ...    278.87

Total ........................ ...............$141,571.45

The receipts, amounting to $26,243.45, for meters and services consisted of money exacted from the consumers along the line of the pipes, ostensibly for the purpose of paying the cost of laying the connecting pipes between the company's mains and the property line and for installing the meters thereon. The receipts, amounting to $14,877.03, for pipe bonuses, were obtained from owners of tracts of land who proposed to subdivide the land into building lots, and who desired the company to extend its pipes into such subdivisions along the streets thereof so as to furnish water to expected residents on the lots, and who paid these sums of money to the company to be used in constructing and laying such mains. The defendants contend that these sums were a part of the legitimate receipts from the operation of the water company in its character as a public service company. We cannot agree with this contention. The mains laid in the proposed subdivisions were clearly a part of the plant of the plaintiff, and the money expended in so doing was a part of its capital investment. The same thing is true of the pipes laid from the mains along the streets to the property line of the consumers and of the meters attached thereto. They were a necessary part of the water system and the expenses thereof were a part of the capital investment and went to make up the total cost of the plant. [6] The source from which the plaintiff received the money which it expended in making these additions to its system is wholly immaterial. If it had borrowed the money for that purpose no one would question the fact that the additions constituted part of the plant and that the borrowed money was not revenue. The fact that the money was paid to the company by the subdivision owners to obtain an extension of the mains and by the consumers to obtain connections with the mains does not in the least change the character of the money so received. After the money had been so paid, whether by donation or otherwise, the plaintiff was the owner thereof and could apply it to that purpose, or to any other purpose it saw fit, provided, of course, it rendered the consideration for which it was given, as otherwise it would have been liable to an action for the return thereof by the payer as money had and received. These sums were not received from the operation of the plant and should not have been added to the receipts from operation.

The question whether or not the value of the parts of the plant constructed with this money should be included in the valuation upon which it was entitled to a return has not been argued, and we express no opinion upon it. It does not affect our decision.

It appears that the company's engineers ascertained that the amounts expended by the company for these additions to its system did not equal the contributions for that purpose and that the company made a profit on that branch of its work amounting to $6,968.67, which those engineers, for the purposes of the case, conceded to be a part of its operating receipts. We do not think this concession can be allowed. The profit must either be considered as a donation to the plaintiff, or as money held by it subject to the demand of the payors. In either case it has no place in the computation necessary to ascertain whether or not the rates fixed by the ordinance are sufficient to give the company a reasonable return on the capital invested in its plant.

[7]   We are satisfied that the court erred in including these two items in the operating receipts of the company. Deducting them from the total operating receipts it would leave a balance of only $100,451.42. Taking from this amount the expenses of operation and amount allowed for depreciation, $89,836.21, the amount left as the net receipts from operation would be only $10,615.21. This would make a return to the plaintiff, as interest on its capital investment, of only 1.27 per cent. There was testimony with respect to the amount that should be allowed as a reasonable rate of interest upon investments of this character, which ranged from six to eight per cent. It is obvious, therefore, that the ordinance rates did not allow the plaintiff a reasonable return on its investment and that it amounted to a confiscation of property. Consequently, it must be held to be void because it is in violation of the constitution of the United States and of this state, being a taking of private property for public use without due compensation, and a deprivation of property without due process of law.

The judgment is reversed.

Olney, J., Wilbur, J., Lennon, J., Sloane, J., Lawlor, J., and Angellotti, C. J., concurred.

Rehearing denied.

All the Justices concurred.