[Crim. No. 858.   Third Appellate District.—December 10, 1925.]

THE PEOPLE, Respondent, v. R. A. BOGGESS, Appellant.

[1] CRIMINAL LAW — CORPORATE SECURITIES ACT — APPLICATION FOR PERMIT—FALSE STATEMENTS—EVIDENCE.—In this prosecution for a violation of section 14 of the Corporate Securities Act, under an information charging defendant with filing with the corporation commissioner an application for permission to issue securities of a certain quicksilver company containing false statements concerning the property held by such company, to the effect that while the defendant had absolute charge of the operations of the quicksilver mine owned by the company in certain years he made it pay over a specified sum per month, net, over operating expenses, the theory of the prosecution that if, during the years mentioned in the information, the net profits for the mine for

any one month were shown to be less than the amount alleged to be net over operating expenses, the falsity of the language set forth in the information was established, is not supported by the evidence.

[2] ID.—STATEMENT REGARDING PRODUCTION OF MINE—EVIDENCE.—In such prosecution, the evidence was sufficient to establish the fact that for a considerable period. of time during the years mentioned in the statement alleged to be false the mine was actually producing the quantity of quicksilver claimed by defendant.

[3] ID.—GENERAL PRODUCTION OF QUICKSILVER—EVIDENCE—NONPREJU-DICIAL ERROR.—In such prosecution, the defendant was not prejudiced by the admission in evidence of certain testimony relating to the general production of quicksilver in the county in which the mine was located, although it does not appear that any effort was made to show the production of said mine further than that it was the principal producer in said county; and since such evidence was not connected with the mine and no effort was .made to connect it with said mine, in the absence of any motion on the part of the defendant to strike out such testimony, it cannot be said that its admission, even though erroneous, amounted to prejudicial error.

[4] ID.—TITLE TO MINE—EVIDENCE—ERROR.—In such prosecution, the trial court erred in admitting in evidence, over defendant's objection, certain deeds relating to the title of the mine where no issue was raised as to the title and where it rested at the time the defendant filed his application with the corporation commissioner, and there was no question made at any time that the defendant was not familiar with the property; and the fact that the sheriff's deed showed a consideration of only $2,500 paid by the purchaser upon execution should not have been admitted for the purpose of allowing the jury to draw an inference that a statement of the production of the mine, at a period some fourteen or fifteen years anterior to its execution, and before operations on the mine had ceased and the premises closed down, was false.

[5] ID.— OBJECTION TO EVIDENCE — WITHDRAWAL OF QUESTION — IN-STRUCTIONS—ABSENCE OF ERROR.—In such prosecution, the erroneous statement of the trial court in overruling defendant's objection to certain evidence as to the average market price of quicksilver during certain years, that part of the statement might be shown to be false, was not prejudicial where the question was withdrawn and a proper instruction given to the jury.

[6] ID.—EVIDENCE — ADMISSIBILITY. — In such prosecution, a private memorandum made by a member of a company purchasing quick-

5.  See 8 Cal. Jur. 251.

silver from the mine of the quantity of quicksilver purchased and the sums paid therefor was inadmissible.

[7] ID.—BUILDING OF FURNACE AT MINE—PART OF CAPITAL INVESTMENT—EVIDENCE—ERROR.—In such prosecution, the trial court erred in permitting testimony as to whether or not the expense of building a furnace upon the mining premises should be considered in determining the operating expenses of the mine, since the furnace was a necessary part of the capital investment and constituted no part of the operating expenses of the mine.

[8] ID.—INSTRUCTIONS — EXTRACTS FROM STATEMENT—CONSIDERATION OF ENTIRE STATEMENT.—While ordinarily instructions which tend to give undue prominence to any piece of testimony should not be given, yet where the prosecution relies upon an extract taken from a lengthy statement in a letter written by the defendant, which letter contains other matters explanatory of the alleged false statement, the defendant is entitled to have the jury instructed to consider the whole statement, and such an instruction is not argumentative.

(1) 37 C. J., p. 279, n. 73.  (2) 37 C. J., p. 279, n. 74.  (3) 17 C. J., p. 71, n. 47, p. 318, n. 11.  (4) 37 C. J., p. 279, n. 72.  (5) 17 C. J., p. 295, n. 63, p. 296, n. 99.  (6) 16 C. J., p. 741, n. 38.  (7) 17 C. J., p. 319, n. 22; 37 C. J., p. 279, n. 70 New.  (8) 16 C. J., p. 1038, n. 80, p. 1069, n. 12.

APPEAL from a judgment of the Superior Court of Sacramento County. Charles O. Busick, Judge. Reversed.

The facts are stated in the opinion of the court.

E. S. Bell and George E. Foote for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

PLUMMER, J.—This is an appeal by the defendant from a judgment of conviction for an alleged violation of section 14 of the Corporate Securities Act (Stats. 1917, p. 680). The information filed against the defendant charges "that the said R. A. Boggess on the —— day of April, A. D. 1920, in the said County of Sacramento, in the said State of California, and before the filing of this Amended Information, did then and there wilfully and unlawfully and feloniously file and cause to be filed in the Office of the Commissioner of Corporations of the State of California,

an application of Alpha Quicksilver Company, a corporation, for a permit to issue securities; that in said application was contained and embodied the following statement concerning the property held by such company, 'During the time Boggess had absolute charge of the operations at the mine in 1900—1 and 2, he made it pay net over $7000.00 per month, Net over all mine operating expenses, quicksilver selling at an average of $45.00 per flask'; that said statement so contained and embodied in said application as aforesaid, is and was false and that said defendant so made said statement in said application with knowledge of its falsity; that at the time said statement was filed or caused to be filed as aforesaid, the said R. A. Boggess was an officer, agent and employee, of said Alpha Quicksilver Company, contrary to the form, force and effect of the Statute in such case made and provided, and against the peace and dignity of the People of the State of California.''

A prior trial of this cause was had resulting in a judgment of conviction, which judgment was upon appeal reversed by the supreme court of this state. (*People* v. *Boggess*, 194 Cal. 212 [228 Pac. 448].) As the facts presented upon this appeal are in most particulars identical with those involved in the former appeal, we may refer to the recital of the facts contained in the opinion of the supreme court and also quote therefrom.

As to the meaning of the charge contained in the information there is a wide divergence of the claim made by the prosecution and the interpretation thereof insisted upon by the defendant. The theory of the prosecution appears to be that if during the period of time mentioned the net profits of the mine for any one month was shown to be less than $7,000 net over operating expenses, then and in that case the falsity of the language set forth in the information was established. This theory is succinctly set forth in respondent's brief as follows:

''In regard to the measure of proof sufficient to support the verdict in this case as to the false statements, if we direct our attention to the first year mentioned (1900) a showing that as to any one of the months thereof there was not a net production of $7,000.00 in value, would be and is sufficient to support the verdict.''

[1] On behalf of the appellant it was insisted in the trial below and upon appeal here that the quoted language set forth in the information, when taken in connection with other statements contained in the application, does not admit of any such construction and that the period of time embraced in the quoted language must be restricted to the months when the defendant had *absolute* charge and not to all the months included within the years referred to, and also, that the whole statement, when read together, shows that the defendant did not intend to convey the idea that for each and every month of the period of time in question the mine produced $7,000 net. The supreme court, in its opinion referring to this matter, states the substance thereof as follows: " . . . that 'in' the year 1898–99, when the mine was acquired by him, he had sole charge of the 'construction and development' work and 'in 1900' he put it on a net paying basis of $7,000 net per month. Of course, the words and phrases employed in the statement, in its entirety, must be taken in their ordinary meaning and so taken the word 'in,' as used in the application with reference to the operation of the mine in the year 1900, may be said to indicate 'inclusion within the limits of the time expressed. . . . 'In' is . . . common in the sense of 'during the course of.' (Webster's New International Dictionary.) Therefore, that portion of the application may be read and understood as meaning that he put the mine on a net paying basis of $7,000 per month some time during the course of the year 1900 rather than during the entire period of that year." The evidence in the case at bar also sets forth the same typographical errors in the statement submitted by the defendant to the corporation commissioner as are commented upon in the opinion of the supreme court, to which we have referred. The evidence upon which the prosecution relied in the former case is practically the same as that relied upon on this trial. We quote again from the opinion of the supreme court: "The case of the prosecution consisted largely, if not entirely, of evidence as to what was the yearly production of the mine from which its monthly production was arrived at by dividing the total production of the year by the number of months in the year. Part of the evidence of the prosecution as to the production of the mine was

embodied in a bulletin of the state mining bureau containing statistics showing the quicksilver production of the state as a whole for the years 1900, 1901 and 1902, together with statistics of the quicksilver production of the individual counties in those years. The production shown by these statistics was a yearly production and not the production per month. The evidence shows that the statistics in this bulletin were compiled from the reports of the various mine owners for each year as to the quantity and value of the production. The statistics for Lake County, where the mine in question is located shows a production in 1900 of 3,165 flasks, valued at $127,345; in 1901 of 4,395 flasks, valued at $211,324, and in 1902 of 3,611 flasks, valued at $161,568. These statistics did not purport to show the individual production of any mine situated in Lake County. It was shown in evidence, however, that the statistics in this bulletin were based in part upon a report sent in by the defendant as to the production of the mine in question in the years 1900 and 1901. This report showed a production of the mine in question for the entire year 1900 to be 1,300 flasks without stating the value thereof. It was the defendant's claim that in the early part of the year 1900 while he was using an eight-ton furnace the production was, on account of the limited capacity of the furnace, much lower than at a later period of the same year, when he was using a forty-ton furnace, and that he put the mine upon a net paying basis of $7,000 net per month after the installation of the larger furnace in September, 1900. The report for the year 1901, during which time the larger furnace was in operation, shows a production of 2,000 flasks worth $100,000.'' As to the cost of production, the evidence appears to be the same in both cases and we hereby adopt the following statement contained in the opinion of the supreme court in the former case as applicable to this, to wit: ''The evidence offered by the prosecution as to the cost of the production of quicksilver at the mine in question, which, of course, was necessary in order to determine the net profit, consisted in a large measure of general estimates to the effect that the average cost of production was about $30 per flask, throughout the quicksilver mines of the state, but this evidence did not relate

to nor purport to bear directly upon the actual cost of labor, fuel, and other operating expenses of the mine in question. It was an undisputed fact in the case that the cost of quicksilver production varies greatly at different mines throughout the state and to such an extent that the cost of production at one mine may be twice as great as at another mine. True, there is other evidence, consisting of general estimates of the cost of production at the mine in question, based upon the probable number of men employed, the probable amount of cordage consumed as fuel, and a general assumption of a sum of money to be added for necessary development work. But it was shown by the testimony of several witnesses, testifying without contradiction upon behalf of the defendant, that the actual number of cords of wood consumed as fuel in the production of quicksilver at the mine in question from September, 1900, to May, 1901, was only two cords per day, which amount is only one-third of the number of cords estimated by the witnesses for the prosecution to be necessary to the operation of the furnace. There is also evidence, uncontradicted, on behalf of the defendant that many of the men employed at the mine received but $2.50 per day, whereas the prosecution's witness estimated the probable cost of labor at the mine at $3 per day for all of the men employed. There was further evidence to the effect that the mine was comparatively dry, very little timbering was necessary, and that it was favorably located for cheap mining in that it was not far removed from rail transportation; that wood for fuel grew in abundance and that there was plenty of water for domestic purposes, steam, etc. Upon behalf of the defendant there was offered and received in evidence an excerpt from 'Mineral Resources of the U. S., Department of Interior, U. S. Geological Survey,' which stated that 'under ordinary circumstances quicksilver could be produced in California at a cost of $3.00 per ton or ore mined and smelted.' And the defendant himself testified that the maximum cost of producing quicksilver at the mine in question, under the conditions existing there, was $3 per ton of ore and that the cost of production per flask of quicksilver was but from $10 to $12 per flask.

"In short, there is direct and positive evidence in the record adduced upon behalf of the defendant tending to show that during several months of the years designated in the application the mine did actually pay over $7,000 net per month over operating expenses. On the other hand, there is evidence consisting of general estimates tending to show that during the said years the mine did not pay $7,000 net per month. It is apparent from a perusal of the evidence adduced upon the entire case that the guilt or innocence of the defendant hinged upon the solution of a perplexing problem which necessarily depended in a large measure upon a close hypothetical situation developed by the evidence of the prosecution as against an actual situation developed by the direct evidence of the defense."

In corroboration of the claims of the defendant of the production of the mine from September, 1900, to 1901, the testimony of the witness Bryant is to the effect that he hauled on an average during that period of time from 280 to 300 flasks of quicksilver per month. This testimony is also corroborated by the testimony of the witnesses Buchanan and Dunfield. The witness Dunfield was in charge of the condenser at the mine for a period of six months commencing in the fall of 1900. This witness testified that there was a large run of quicksilver during that period of time. The testimony of the witness Roeth, referred to in the opinion of the supreme court, showing a production of 273 flasks in the month of November and 304 flasks in the month of December, 1900, and 257 flasks in January, 265 flasks in February, 255 flasks in March and 188 flasks in May was excluded upon the second trial for reasons which we will hereafter consider, and is not taken into account in considering the testimony showing the production of the Abbott Mine at any time during the period when the defendant admits he was in absolute charge.

The defendant testified that he intended to refer only to the time when he had absolute charge of the mine and also testified to a considerable extent as to the period of time during the years mentioned when he did have absolute charge. A considerable portion of appellant's brief is devoted to the subject of absolute charge and what is meant by that term. We do not think it necessary

to review this argument as the term "absolute" has a clear and definite meaning and would carry with it the idea of being able to direct and control the operation of the mine as the defendant thought best, without let or hindrance or direction by any other person, and that he was free to do what he thought best in conducting mining operations. The statement from which the alleged false extract is taken contains references to other records and to other statements made by the defendant more than twenty years prior to the application for permit to sell stock involved in this action, from which it appears that the defendant at that period of time made the statement that the mine in question had shown a profit of more than $7,000 per month for a considerable period of time, and if this statement made at that time is correct, and the defendant upon this trial testified that it is true, it would appear to be clearly established that for some several months the mine was actually producing the amount claimed by the defendant. People's Exhibit No. 4, being a report made by the defendant to the California State Mining Bureau of February 23, 1901, reads: "The Abbott Mine, however, produced about 1300 flasks during the year 1900 and as an additional furnace was installed in that year, we are now producing at the rate of 3600 flasks a year." The defendant also testified that in 1900, after the forty-ton furnace was put in operation during the months of November and December, the mine produced 600 flasks. This would leave 700 flasks as the production of the eight-ton furnace from January 1st to November 1st of the year 1900. The defendant further testified that from November 1, 1900, to May 1, 1901, the mine produced on an average of 270 flasks per month. It is argued by counsel for appellant that there is not a scintilla of evidence contradicting this testimony. Our attention has not been called to any and we have not found any such evidence.

For the year 1901 the state mining bureau shows a report of the production of the Abbott Mine of 2,000 flasks. To offset this testimony, the defendant introduced testimony to the effect that the ownership of the mine was changed on May 4, 1901, and that the report did not cover the entire year, only the period of time that elapsed after the change of ownership. The testimony of the witness

Ansel introduced by the prosecution was to the effect that the cleanups worked out about twelve pounds of quicksilver per ton of the ore handled by the forty-ton furnace during a period of about eighteen months. The testimony of the witness Forstner, also a witness for the prosecution, was to the effect that the ore ran from fifty to sixteen pounds of quicksilver per ton, which would average about eight flasks of quicksilver per day (Trans. 289). This testimony has been erroneously quoted as five or six flasks per day.

[2] If believed by the jury there is plenty of testimony in this case as shown by the records referred to, in the exhibits offered by the prosecution and the testimony on the part of the defendant, to establish the fact that for a considerable period of time during the years mentioned in the statement alleged to be false that the Abbott Mine was actually producing the quantity of quicksilver claimed by the defendant. This made it important to inquire into and determine the cost of producing quicksilver. It appears from the report of the United States Geological Survey introduced as one of the exhibits in this case that, under ordinary conditions during 1901, quicksilver was produced in California at a cost of $3 per ton of ore mined and smelted. This the defendant claims is corroborative of his own testimony. The witness Gibson, another witness for the prosecution, testified that he produced quicksilver from the Abbott Mine, the one operated by the defendant, at a cost of $10 a flask when he was operating the same with an eight-ton furnace. This is corroborative of the testimony of the defendant. There was also testimony introduced by the prosecution that the cost of producing quicksilver was in the neighborhood of $30 or $35 a flask which, if true, might show that the Abbott Mine never produced $7,000 net during any month of the period when the defendant was in absolute charge. The testimony was also conflicting as to the number of men employed, running all the way from thirty-two to sixty in number. In this connection it may be well to state that the testimony of a large number of witnesses was based solely upon recollection of occurrences taking place more than twenty years prior to the date of the day on which they were giving testimony. The testimony as to the number of men em-

ployed and as to all the items of cost entering into the operation of the mine, of the various witnesses, was based upon statements and not upon actual experiences in operating either the Abbott Mine, or any other quicksilver mine, during the time covered by the charge contained in the information. The quantity of quicksilver produced by the mine as shown by the reports and the testimony of the defendant, and of the employees who handled the quicksilver, as we have stated, if believed by the jury, would support the defendant's assertions. Based upon the evidence introduced in the case which supports the defendant's theory, the following tables contain a summary of production costs, based upon the number of men estimated to be employed during a six-months' period of time the defendant claims to have had absolute charge of the operations of the Abbott Mine.

RECAPITULATION "A"

| Men on Payroll | Amount Payroll | Add 55% all other Expenses | Total Expenses | 270 fl. at $45. Selling Price | Net Monthly Profit |
|---|---|---|---|---|---|
| 32 | $1898.00 | $1044.41 | $2942.41 | $12150.00 | $9207.59 |
| 35 | 2067.50 | 1137.12 | 3204.62 | 12150.00 | 8945.38 |
| 40 | 2298.00 | 1263.90 | 3561.90 | 12150.00 | 8588.10 |
| 45 | 2555.50 | 1405.52 | 3961.02 | 12150.00 | 8188.98 |
| 50 | 2798.00 | 1538.90 | 4336.90 | 12150.00 | 7813.10 |
| 55 | 3054.50 | 1679.97 | 4734.47 | 12150.00 | 7415.53 |
| 60 | 3298.00 | 1830.90 | 5111.90 | 12150.00 | 7038.10 |

RECAPITULATION "B"

| Men on Payroll | Amount Payroll | Add 66⅔% all other Expenses | Total Expenses | 270 fl. at $45. Selling Price | Net Monthly Profit |
|---|---|---|---|---|---|
| 32 | $1898.00 | $1265.38 | $3163.33 | $12150.00 | $8986.67 |
| 35 | 2067.50 | 1378.34 | 3445.84 | 12150.00 | 8704.16 |
| 40 | 2298.00 | 1532.00 | 3830.00 | 12150.00 | 8320.00 |
| 45 | 2555.50 | 1703.66 | 4259.16 | 12150.00 | 7890.84 |
| 50 | 2798.00 | 1865.32 | 4663.32 | 12150.00 | 7486.68 |
| 55 | 3054.50 | 2036.32 | 5090.82 | 12150.00 | 7059.18 |

We are not unmindful of the fact that it is for the jury to determine both the accuracy or nonaccuracy of the figures submitted to it for consideration and of the truth or falsity of the testimony of the various witnesses. We have

simply set forth the testimony showing that the guilt or innocence of the defendant rests upon mathematical calculations based upon testimony which, in turn, rests upon estimates as we have heretofore stated, and thus necessitates an examination of the rulings of the court in the admission and exclusion of testimony during the course of the trial and also alleged errors in the refusal to give requested instructions to the jury by the court.

[3] The first assignment of error in the admission of testimony is that of overruling the objection of the defendant to the testimony of the witness Bradley, founded upon a book entitled, "Quicksilver Resources of California, Bulletin 78, covering the production of quicksilver of the County of Lake for the years 1900, 1901 and 1902." This testimony was to the effect that in the year 1900 there was produced in Lake County 3,165 flasks; in 1901, 4,395 flasks, and in 1902, 3,611 flasks. It does not appear that any effort was made to show the production of the Abbott Mine further than the Abbott Mine was the principal producer of Lake County for those years. We do not find in the admission of this testimony any prejudicial error that would justify a reversal of this cause. The evidence was not connected with the Abbott Mine, and no effort having been made to connect it with the Abbott Mine other than as above stated, the defendant should have moved the court to strike out the testimony. This not having been done and the testimony as it stood showing a larger production for Lake County than that claimed for the Abbott Mine, and also that the Abbott Mine was the principal producer, it is a matter of argument to the jury as to whether the testimony was or was not as favorable to the defense as to the prosecution. This being true, we cannot say that its admission, even though erroneous, amounts to prejudicial error.

[4] In assignment of error No. 4, we think the record presents a more serious objection. Over the objection of the defendant, the prosecution was permitted to introduce a number of deeds relating to the title of the Abbott Mine. There does not appear to have been any issue whatever raised as to the title to the Abbott Mine and where it rested at the time the defendant filed his application with the Corporation Commissioner as alleged in the informa-

tion. The record of the deeds concerning the devolution of the title to the Abbott Mine shows that in March, 1915, based upon an execution sale some time previously, the Abbott Mine was conveyed by the sheriff of Lake County to one Willson for the sum of $2,500. In answer to the objection of the defendant, counsel for the prosecution stated: "Now, by tracing it on down, to show the title to the Alpha Quicksilver Mining Company, I also show by putting in that evidence,—show that Mr. Boggess was thoroughly acquainted and conversant with this land in question, and has been for many years, knowing, and has been in charge." Opposing this the defendant's counsel queried: "Wherein does the fact that McKelley, sheriff of Lake County, made a deed to the man Willson, show any intent in years afterwards? How is the defendant to be charged by the fact that the property was sold to Willson in 1909 or 1908, and, subsequently, Boggess bought it from Willson,—Where does that go to prove any knowledge on the part of Boggess,—when he bought it from Willson, show any knowledge,—that he did not produce seven thousand dollars in 1901 and 1902?" The objection was overruled, the court stating that it was not admitted to show any judgment. The defense counsel then asked: "Do I understand, now, the Court, that the introduction of these deeds is limited to the purpose of showing the title, and not for any other purpose,—It is limited to that?" The Court: "Well, any purposes they are material for, not limiting the purpose of it. They are admissible to show the title. Now, then, if the jury, from that, draws the inference of knowledge of the conditions there by the defendant, they are entitled to draw such inference as the instrument itself justifies them in drawing, but it is not admitted for the purpose of showing the judgment. It is not material for the purpose of showing the judgment at all." Further deeds were introduced showing that the defendant subsequently bought the property for the sum of $6,500. There was no question made at any time that the defendant was not familiar with the property, and the fact that the sheriff's deed showed a consideration of only $2,500 paid by the purchaser upon execution should not have been admitted for the purpose of allowing the jury to draw an inference that a statement of the production of the mine

at a period some fourteen or fifteen years anterior to its execution, and before operations on the mine had ceased and the premises closed down were false.

[5] Under assignment of error No. 8, the transcript shows that the witness Forstner was asked as to the average market price of quicksilver during the years 1901 and 1902 and 1903, which question was objected to by the defendant on the ground that it was immaterial, irrelevant, and incompetent, and the court, in overruling the objection, stated: "In the statement it is charged that during the time Boggess had absolute charge himself in 1900, 1901, and 1902 he made it pay 'net' over the mine operating expenses, quicksilver selling at an average of $45.00 per flask, $7000 per month. Now, that is the whole statement he is charged with as having been false, and they have a right to show what portion of it is false or if any of it is false." Under the charge contained in the information, the ruling was erroneous, as the defendant is not charged with having asserted that quicksilver was selling at $45 a flask, but that the mine netted a certain sum when quicksilver was selling at a certain price, but the record shows that the question was afterward withdrawn, and as a proper instruction was afterward given by the court to the jury, we do not think that the erroneous statement of the court made to counsel when overruling the objection could have been seriously considered by the jury, or, at least, to the extent of influencing prejudicial action on their part. We therefore confine ourselves simply to the statement that the remarks of the court did not correctly interpret the charge.

[6] The next assignment of error which we will consider is that of the exclusion of the testimony of the witness Roeth. The transcript shows that the witness Roeth was a member of a quicksilver company that purchased quicksilver produced by the Abbott Mine during the years 1900, 1901, and 1902; that it was the custom or practice of the quicksilver purchasing company to make out monthly settlement sheets, upon which settlements were made and payments made to the companies from which quicksilver had been purchased; that these settlement sheets were by the secretary of the purchasing company submitted to the witness Roeth, who made a private memorandum of the quantity of quicksilver purchased and the sums paid there-

for. It appears that the records of the company engaged in purchasing quicksilver had been lost or destroyed, and upon this showing the defense sought to introduce the private memorandum made by the witness Roeth. No authority has been called to our attention supporting the introduction of such testimony, and we think it objectionable on the ground that private memorandum was of no more effect or validity than would have been a statement by the witness Roeth that the secretary of the company had told him of the monthly production of the Abbott Mine and of the sum of money paid therefor.

[7] The next objection which we deem it necessary to consider is that relating to the items of expenditure permitted by the court to go to the jury in order to determine the operating expenses. As heretofore stated, a forty-ton furnace was installed upon the premises and put in operation late in the fall of 1900. When the defendant was on the stand, the defendant was asked the following question: "Well now, can you give us some idea of what it cost to construct this furnace?" To which question the defendant objected on the ground that it was irrelevant, incompetent, and immaterial. The court overruled the objection, and, in so doing, stated as follows: "The cost of putting the tunnel there, and the tunnel is there yet. You offered evidence of that, showing the cost of development. That is there yet. . . . —part of the cost of operating the mine, and it would go to show whether there was a profit or not, what they paid out for the operating of the mine, and what they sold their ores for. That was just as much a part of the operating cost as the picks and shovels. It would be necessary to have the furnace; it was necessary to have the furnace, apparently, to operate the mine. They built it, and you have offered the evidence of the cost of the fuse, and caps, and powder, and wood." We think it is almost axiomatic that the cost of building a furnace cannot under any conditions be considered as an operating expense. As said by counsel for appellant, the ruling of the court simply left it to the jury to say that if the appellant expended $60,000 in 1900 in building a furnace, it should be considered as a part of the operating expenses of the mine. This, of course, would exclude the possibility of the mine having produced the sum of $7,000

net over and above operating expenses during the period of time the defendant admits he had absolute charge of the premises. A somewhat similar question was presented to the supreme court of Massachusetts in *Eastern R. R. Co. etc.* v. *Rogers,* 124 Mass. 527, where it was held that interest on money borrowed to build an uncompleted portion of the leased lines of the railroad could not be considered as an operating expense. In the case of *Union Hollywood Water Co.* v. *City of Los Angeles,* 184 Cal. 535 [195 Pac. 55], a somewhat similar question was also presented for determination. It was there contended that receipts of bonuses in the sum of $14,877 paid by owners of tracts of land proposing to subdivide the same for the purpose of having the company extend its pipes to such subdivisions should be considered as a part of the revenue from the operation of the plant by the water company. The court said: "We cannot agree with this contention. The mains laid in the proposed subdivisions were clearly a part of the plant of the plaintiff, and the money expended in so doing was a part of its capital investment. The same thing is true of the pipes laid from the mains along the streets to the property line of the consumers and of the meters attached thereto. They were a necessary part of the water system and the expenses thereof were a part of the capital investment and went to make up the total cost of the plant." The furnace under consideration was a necessary part of the capital investment and, just as said in the Hollywood case, necessarily became a part of the capital investment and constituted no part of the operating expenses of the Abbott Mine. It is not necessary to say that the mine could not be operated without a furnace any more than it would be to say that railroad trains cannot be operated until a railroad track is first built, but, it does not follow that the cost of running a train involves a capital investment in the building of a railroad line. It may be also said that the question of dividends or profits to the owners of the plant in question is an entirely different proposition from operating expenses. For while the receipts may exceed the operating expenses, if the capital invested is large, the dividends available might be very small even though the operating receipts considerably exceed the operating expenses. The jury, as we have said, were given

an item of capital expenditure in the sum of $60,000 (the evidence showing that sum as the approximate cost of the furnace), which should have been excluded from their consideration, and from the fact, as we have heretofore shown, there was evidence which, if believed by the jury, entitled the defendant to a verdict, the conclusion is unavoidable that prejudicial error resulted from the admission of this testimony.

It is also urged that the court erred in refusing to give to the jury the following instruction requested by the defendant: "I instruct you that in arriving at a verdict in this case you should take into consideration with all the other testimony all of the statements contained under the heading of General Statements in the letter of January 29th, 1920 and all of said statements should be read together in arriving at the meaning and purpose and intent of the Defendant in making the alleged false statement charged in this case and I further instruct you that after a careful consideration of all of the statements contained in said letter and all of the other testimony offered in the case, unless you find beyond a reasonable doubt and a moral certainty, that defendant is guilty of said charge, your verdict must be not guilty. Endorsed: 'Argumentative; refused.' "

[8] We think that the instruction is not argumentative, and while ordinarily instructions which tend to give undue prominence to any piece of testimony should not be given, yet in this case, where the prosecution relies upon an extract taken from a lengthy statement in a letter written by the defendant, which letter, as we have shown, contains other matters explanatory of the alleged false statement, we think the defendant was entitled to have the jury instructed to consider the whole statement. The fact that there was a sharp divergence in the interpretation given by the prosecution and the defense to the extract taken from the defendant's statement and the further fact that the language alleged to be false is ambiguous as to whether it does or does not limit the period of time to the months the defendant was in absolute charge, and also the fact as to whether the defendant intended to include each and every month as producing $7,000 net, or only for a certain period of time, was to be determined

by the jury, entitled the defendant to the instruction asked for. In the determination of what was meant by the defendant in the quoted extract all the statements contained in the letter of which it was a part should be considered. While we think the instruction should have been given, we do not need to rule that its refusal constituted prejudicial error necessitating reversal, because for other reasons stated herein such order must be made.

The appellant assigns numerous remarks by the court during the course of the trial as prejudicial error, but on account of the conclusions to which we have already arrived, it seems unnecessary to consider such assignments of error.

The question of the statute of limitations presented by the appellant has been definitely adjudicated by the supreme court in the case of *Doble* v. *Superior Court*, 195 Cal. 556 [241 Pac. 852], and need not be considered herein.

The judgment and order are reversed and the cause remanded for a new trial.

Hart, J., and Finch, P. J., concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 8, 1926.